Filed 1/11/22 (unmodified opinion and 12/16/21 modification order attached)
**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE MAYORGA JIMENEZ,<br><br>    Defendant and Appellant. | E074849<br><br>(Super.Ct.No. 16CR021449)<br><br>ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The petition for rehearing filed on December 29, 2021 is DENIED.

The majority opinion filed in this matter on December 14, 2021, and modified on December 16, 2021, is further MODIFIED as follows.

On page 13, line 17, after the words, "'I just figured I was just going to take the rap for everything . . . ,'" insert as new footnote 4:

> [4]    The record provided to us by the parties included a transcript of the interrogation, but not the video of it. After we filed our opinion, the People asked us, in a petition for rehearing, "to review the video and reconsider and modify [our] opinion in light of the contents of the video." At the same time, they made a belated request for transmission of the original video, and they gave us what they represented to be a copy of it.
>
> In the interest of ensuring that the appeal is decided based on a full record, we have viewed the video. We find

1

nothing in it that adds anything relevant to the transcript or that affects our analysis. It still shows that it was only after Detective Munoz threatened to charge his sons with homicide that defendant showed eagerness to cooperate and began to implicate himself in a crime. We will retain the original video until we issue our remittitur (see Cal. Rules of Court, rule 8.224(d)), so it will be available to a higher court.

All subsequent footnotes are renumbered accordingly.

The dissenting justice is making the following modification to the dissent:

On page 16 of the dissent, at the end of the last full paragraph, which ends with the words "force anybody to say what they said," insert as new footnote 6:

> **6** In their rehearing petition, the People asked us to view the video of the confession. Consistent with Jimenez's trial lawyer's view, as well as that of the People, the video generally shows about an hour-and-a-half of an attentive, soothing officer questioning a voluble, obliging suspect.
>
> About 45 seconds into the interview—while Munoz was removing Jimenez's handcuffs and before Munoz had even sat down—Jimenez declared that his sons did not know anything about what was going on. About a minute later, Jimenez interrupted Munoz to state that he told his sons to get out of the car because they had nothing to do with the crime. These interjections, coming before Munoz's statement that concerns the majority, are among the video's displays of Jimenez's eagerness to talk to clear his sons.
>
> Indeed, the People argued that the "nonverbal aspects of the video . . . so clearly show a lack of coercion [that] they may well explain counsel's failure to object," and that the lack of objection "deprived the People of the opportunity to rely on these nonverbal aspects" to litigate voluntariness. They argued that the video showed Jimenez eager to speak to Munoz; that Munoz did not raise his voice, speak harshly, or "present himself as intimidating or angry"; that Munoz took off Jimenez's handcuffs immediately upon entering the room; that Jimenez did not appear scared, intimidated, or frustrated; and that his body language did not communicate coercion. The People said that if the issue were litigated in trial court, they would rely on "the flow of the interview, [Jimenez's]

2

body language, observable signs of [Jimenez's] physical or mental condition, the positioning of [Jimenez] and Detective Munoz, and the parties' demeanor, tone, and inflection." They argued that the video shows Jimenez's "age, mental level, and intelligence" and that he was "articulate," while "nothing in the video [showed] that he was below average in intelligence or particularly susceptible to coercion." Having viewed the video, I agree with the People's interpretation.

Through trial, the defense viewed the video in the same light. Jimenez's trial counsel expressly argued that the video shows Munoz did not overbear Jimenez's will. Jimenez himself testified that he was willing to talk to Munoz and felt comfortable doing so. I find no appropriate basis in the record to disagree. Rather than the majority's de novo reversal of the conviction based on a view of the video disavowed by the defense at trial, the People should have the chance to litigate all the circumstances in trial court (at this point, in conjunction with a habeas petition), including confronting Jimenez with the video if he now wishes to testify that he was coerced.

Except for these modifications, the opinion remains unchanged. This modification does not effect a change in the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

RAPHAEL
J.

cc:     See attached mailing list

3

MAILING LIST FOR CASE: E074849
The People v. Enrique Jimenez


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


Susan Elizabeth Miller
Office of the State Attorney General
P. O. Box 85266
San Diego, CA 92186-5266


Cynthia M. Jones
Avatar Legal PC
19363 Willamette Drive, #194
West Linn, OR 97068


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE MAYORGA JIMENEZ,<br><br>    Defendant and Appellant. | E074849<br><br>(Super.Ct.No. 16CR021449)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on December 14, 2021 is modified as follows:

On page 8, footnote 3 is deleted. All subsequent footnotes are renumbered accordingly.

Except for these modifications, the opinion remains unchanged. This modification does not effect a change in the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ           

P. J.

We concur:

McKINSTER       

J.

RAPHAEL        

J.

1

cc:      See attached mailing list
MAILING LIST FOR CASE: E074849
The People v. Enrique Jimenez


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


Susan Elizabeth Miller
Office of the State Attorney General
P. O. Box 85266
San Diego, CA 92186-5266


Cynthia M. Jones
Avatar Legal PC
19363 Willamette Drive, #194
West Linn, OR 97068


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396

Filed 12/14/21 (unmodified opinion)
See Dissenting Opinion

CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE MAYORGA JIMENEZ,<br><br>　　　Defendant and Appellant. | E074849<br><br>(Super.Ct.No. 16CR021449)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steve Malone, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Arlene A. Sevidal, Randall

---

\*　　　Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV.

1

D. Einhorn and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A police officer spotted defendant Enrique Mayorga Jimenez and his two teen-aged sons by some trash cans in a field. They jumped into an SUV and drove away. The officer, believing that they had committed illegal dumping, tried to pull them over. Instead, defendant dropped off his sons near his house, then led the police in a pursuit that went from Highland to Downey. When the police took a closer look at the trash cans, they found that one contained a dead body. Defendant confessed that he made a considered decision to kill the victim and then intentionally stabbed him to death.

In a jury trial, defendant was found guilty of first degree murder (§ 187, subd. (a), 189),[1] with an enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)); recklessly evading an officer (Veh. Code, § 2800.2, subd. (a)); and two counts of aggravated assault on a peace officer (§ 245, subd. (c)). As a result, he was sentenced to a total of 29 years to life, plus the usual fines, fees, and ancillary orders.

Defendant contends, among other things, that his confession was involuntary because the police induced it by threatening to charge his sons with the murder.

We agree. As a general rule, "[a] confession coerced by a threat to arrest a near relative is not admissible. [Citations.]" (*People v. Matlock* (1959) 51 Cal.2d 682, 697.) There is an exception to this general rule when the police have probable cause to charge

---

**1** This and all further statutory references are to the Penal Code, unless otherwise indicated.

the relative. In other words, when it is simply a fact that they could charge the relative, it is not unduly coercive to point that out. Here, however, the interrogating officer told defendant that he knew defendant's sons were innocent of murder, but he intended to charge them anyway — unless defendant confessed. Hence, the general rule applies.

We cannot say, beyond a reasonable doubt, that if defendant's confession had been excluded, he would still have been convicted of first degree murder. Indeed, it is reasonably probable that the jury would have found him guilty of a lesser offense, such as second degree murder or involuntary manslaughter, or acquitted him on this count.

I

STATEMENT OF FACTS

A.     *The Corpus Delicti.*

On the night of May 19-20, 2016, around midnight, Sheriff's Deputy Jeffrey Casey was on patrol in Highland when he noticed a white Chevy Suburban, with an attached trailer, parked next to an open field. He then saw three males and two trash cans in the field. The males ran to the Suburban, got in, and drove away.

Deputy Casey suspected that they had committed illegal dumping. He followed the truck and started to make a traffic stop by turning on his flashing overhead lights.

The Suburban "sped away." After going a few blocks, however, it made a U-turn and went back to where the trash cans were. The driver leaned out the window, lifted the lid of one of the trash cans, and used a lighter to set fire to the contents. To stop him

from destroying evidence, Deputy Casey rammed the back of the Suburban. The driver dropped the lid, which extinguished the fire.

The Suburban drove off again. Deputy Casey followed, with his lights flashing and his siren on. At Elmwood Road, the Suburban stopped and dropped off the two passengers. Officers at the scene chased them and arrested them. They were identified as defendant's sons, E.J. (aged 14) and J.P. (aged 17). Defendant lived on Elmwood Road.

The Suburban then drove off again. After it got onto the I-210 Freeway, the California Highway Patrol joined in the pursuit. The Suburban continued onto the I-10, I-710, and I-105 Freeways. It finally got off the freeway at Lakewood Boulevard, in or near Downey.

During the pursuit the Suburban sometimes exceeded the speed limit and sometimes went through red lights and stop signs. Once, it drove on the wrong side of the road.

The police traced the license number of the trailer to an address in Downey.[2] Accordingly, two Downey police officers were stationed in an intersection near that address. Their patrol cars were parked side by side, an estimated five to fifteen feet apart, pointed north. A time-stamped video from a camera in one of the cars was played for the jury.

---

[2] Defendant had relatives in Downey.

The officers saw the Suburban coming south toward them, at either 30 to 40 miles an hour (according to one officer) or 45 miles an hour (according to the other). They turned on their headlights and their flashing overhead lights. They did not think there was enough room for the Suburban to go between their cars. They got out and ran to opposite sides of the street.

At the last moment — about 10 seconds after the officers turned on their lights, and about 5 seconds after they got out — the Suburban finally slowed down. Two seconds later, it drove through the gap between the cars, scraping the front fender of one of them.

An officer in the leading pursuit vehicle did not believe that he had room to go between the cars. However, there was room to go around them on the right. All of the pursuit vehicles did so and continued the chase.

Finally, the Suburban stopped. The driver got out and ran; officers ran after him and arrested him. Defendant was the driver. The Suburban was registered to him.

The two trash cans in the field were "generic" city-issued residential green waste containers. In the partially burnt trash can, the police found a dead body, head downward and feet upward. A pair of sunglasses was by its side. It was identified as that of Morris Barnes, with an address on Elmwood Road.

Barnes had been stabbed once in the upper back and three times in the front of the neck, causing death within minutes. The police found a hunting knife, in a sheath, inside his jacket, tucked into his pants.

5

Gasoline had been poured on the body. Inside the unburnt trash can, the police found, among other things, a half-full gas can.

On the floor of defendant's garage, the police found "potential blood stains" that appeared to have been partially wiped up.

Defendant's stepmother-in-law testified that, sometime in May 2016, defendant said "he was hearing on the streets that there was going to be a home invasion." While on that topic, defendant said "he was going to take care of" someone named "Maurice."

B.      *Defendant's Confession.*

When Detective John Munoz interviewed defendant, defendant admitted killing the victim.

Defendant referred to the victim as "Maurice." The victim lived seven or eight houses away. He and the victim were friends.

The victim, however, was a gang member. About a week earlier, defendant had heard that the victim told some fellow gang members who "do home invasions" that defendant grew marijuana in his home. He also told them that defendant and his children were often away from home. At one time, defendant grew marijuana for his own personal use, but he had stopped. He lived with his elderly mother, who was disabled; he thought the robbers would enter after they saw him leave the house, find nothing, and hurt her.

Defendant was already under stress, because his wife was in the hospital, paralyzed from the neck down, following an accident the preceding month in which defendant was driving.

Two nights before the police pursuit, the victim walked by defendant's house, on his way to buy some beer. He asked for a ride, so defendant drove him to the liquor store and dropped him off.

Defendant was outside his house when the victim came walking back with his beer. As defendant put it, the victim was still "trying to be my friend like nothing [happened]." Defendant thought about killing him but could not make up his mind.

He invited the victim to "kick it" in his garage. After the victim drank a beer, defendant said, "I don't understand how can you tell my business to other people and put my mom and my family in harm's way." The victim said, "What are you talking about?" Defendant kept insisting that he knew; the victim kept denying it. Defendant decided, "[If] you're gonna play stupid with me, then instead of go along with [t]hat I think that I need to make sure that nothin' happens to my mom."

Defendant went into his house and got a kitchen knife, with a black handle. Defendant "grabbed him [in] a headlock" and stabbed him "[t]owards his neck." He put the dead body in a trash can. The victim was wearing glasses, and these also went in the trash can. There was some blood on the ground, but defendant cleaned it up. He poured gas from a gas can onto the body.

7

Defendant left the trash cans in an open area that he knew about. When he saw an officer, he fled, but then he realized he had not set fire to the body. He made a U-turn. He "flicked" a lighter. At some point, he told his sons "this guy had run his mouth and I couldn't afford that."

There were several discrepancies between defendant's confession and the physical evidence.[3]

Defendant said he stabbed the victim only once, in the front. When Detective Munoz said the victim had been stabbed in the back, defendant repeated that he stabbed him only once, but he suggested that maybe the knife came out the back. Then, when Detective Munoz asked, "Do you think that maybe . . . you stabbed him again?," he agreed that he stabbed him twice. Finally, Detective Munoz asserted that defendant stabbed the victim twice in the neck and once in the back, and defendant agreed.

Defendant gestured as if stabbing upward. However, all of the victim's wounds were downward.

At first, defendant did not remember what he did with the knife; however, when asked if he put it in the trash can, he said, "I think so." He could not explain why no knife meeting his description was found with the victim.

When asked what he did with the clothes he was wearing, defendant said he threw them in the trash can. No such clothes were found.

---

[3]    As we are reversing based on ineffective assistance of counsel, it seems worth noting that defense counsel did not bring out these discrepancies in his closing argument.

C. *Defendant's Testimony*.

Defendant testified that he gave the police a false confession because they threatened to charge his sons with murder. He claimed that the very first thing the officer said to him was, "Your boys are arrested for murder." He admitted that that statement was not in the video. However, the video did show that the officer eventually threatened to charge his sons with murder.

Actually, defendant saw someone else's trash can in front of his house, looked inside, and found the body. He recognized the victim's shoes. The trash can already had fire damage.

Just then, defendant got a phone call about a medical emergency involving his wife. He rolled the trash can into the garage. As he did, some liquid spilled out. He cleaned up the liquid, then went to the hospital.

He did not call the police, because he had "lost faith" in them after an incident in which they had falsely accused him of a crime, hit him with a gun, and let a police dog bite him.

Defendant was familiar with the open field and decided to leave the body there. He brought his sons along to help him do it quickly. He denied setting fire to the trash can.

When asked if he saw the two parked police cars, he said, "Not at first." When he drove between them, he "did [his] best not to hit" them. He finally stopped because he ran out of gas.

9

Defendant could not explain how he knew the victim had been stabbed.

Defendant believed his stepmother-in-law was lying because she had never liked him and she blamed him for the accident in which his wife had been injured.

II

THE VOLUNTARINESS OF DEFENDANT'S CONFESSION

Defendant contends that the trial court erred by admitting his confession because it was involuntary.

A.     *Additional Factual and Procedural Background.*

Defendant's entire statement to the police was admitted into evidence.  Defense counsel did not object.

At the beginning, there was this discussion:

"Det. Munoz:  Okay, you're Enrique, right?

"[Defendant]:  Yeah.

"Det. Munoz:  Okay, and your son is J[.], and — and E[.], right?

"[Defendant]:  Yeah.

"Det. Munoz:  Okay, stand up.  Okay, I'm Detective Munoz and I work here at the police department.

"[Defendant]:  Okay.

"Det. Munoz:  And I'm going to try to find out what this all about, and you know, obviously, you took off to, all the way to Downey and you know all that and -

"[Defendant]:  Yeah.

10

"Det. Munoz:  And you know about the trashcans and you know what was in 'em. We talked to your — to, we talked to J[.], we talked to E[.] and they told me all about it, so I just need to get your side of the story about what's going on here, okay?

"[Defendant]:  Well, they didn't know nothin' about what was going on.

"Det. Munoz:  Huh?

"[Defendant]:  They didn't know basically nothin'[.]

"Det. Munoz:  Well, I know that, but you know, there were some little things that — a — that they knew because they're not dumb, they're smart, and they're smart enough to realize why we going to Downey, and why we — why we, you know —

"[Defendant]:  Uh huh.

"Det. Munoz:  You know, eventually they admitted that there were some things in there that — that lead us to believe something terrible happened to this guy, and um, I think you know a little bit about it, so, or if not a little, you know a whole lot.  Hold on a second.

"[Defendant]:  Okay.

"Det. Munoz:  Okay, so I'll tell you what — what — why don't you come over here.  Your name is Enrique, right?

"[Defendant]:  Yeah.

"Det. Munoz:  Sit over here Enrique, please.  All right, so there's, there's a whole lot of things that happened from 6th Street to the pursuit, to — to your boys jumping out, and then —

11

"[Defendant]: I told them to get out because they had nothin' to do with it.

"Det. Munoz: Okay, yeah, they told me that and so, what — and then we — we eventually looked in the trashcan, we found out who's in there, we know who's in there —

"[Defendant]: Uh huh.

"Det. Munoz: Okay? And a — so E[.] and both J[.] are a little afraid, but they eventually told me everything that that they were asked to do. *Okay, you're right, they had nothing to do with this, they didn't do this —*

"[Defendant]: Mmm hmm.

"Det. Munoz: *But you're gonna be the one to help them.*

"[Defendant]: Yeah.

"Det. Munoz: *Because I'm gonna have to charge them with the death of this guy.*

"[Defendant]: Why?

"Det. Munoz: *Until I can find out what happened.*

"[Defendant]: *Okay, well I'll talk to ya and tell ya what happened, okay?*

"Det. Munoz: *Okay, all right. And then once we do all of that, then we'll be able to, you know, to clear them from this and then we'll move on, okay?*

"[Defendant]: *Great.* So, I mean they didn't have nothin' to do with it, I mean you know —

"Det. Munoz: Yeah, and from what I understand, it sounds like they were just like, um um asked to — to do certain things and that [*sic*] didn't really, didn't really want

12

to get involved in any of this, so that's understandable, you know. Kids are usually gonna do what their dad asks them to do, and um, um, J[.] told me that if he knew what was going on and what happened, he wouldn't have got involved in this.

"[Defendant]: Yeah, I know, and I shouldn't have involved them.

"Det. Munoz: Huh?

"[Defendant]: I shouldn't have involved any of them.

"Det. Munoz: Well, you know, some things you have to do some things sometimes, so we, but that's why I'm here, to talk to you about it[.]

"[Defendant]: Okay.

"Det. Munoz: *So I want to be able to try to help you and your boys, mostly the boys, so —*

"[Defendant]: Mmm hmm.

"Det. Munoz: *So we don't have to make them criminals.*

"[Defendant]: *Yeah, yeah, yeah, yeah.*" (Italics added.)

After Detective Munoz *Mirandized* defendant, defendant gave a statement in which he confessed to killing the victim. He repeatedly said his sons did not know anything about it and he did not want them to go to jail. He said, "So, I can't have them go to jail. I just figured I was just going to take the rap for everything . . . ."

13

B.    *Discussion.*

1.    *Forfeiture.*

Preliminarily, the People contend that defense counsel forfeited defendant's

contention that his confession was involuntary by failing to object below.

It is hornbook law that an objection to evidence is forfeited for purposes of appeal

if not raised below.  (Evid. Code, § 353, subd. (a).)  This rule applies to an objection that

a confession was involuntary.  (E.g., *People v. Kennedy* (2005) 36 Cal.4th 595, 612,

disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

However, it is equally hornbook law that "we may consider new arguments that

present pure questions of law on undisputed facts.  [Citations.]"  (*People v. Runyan*

(2012) 54 Cal.4th 849, 859, fn. 3; accord, *People v. Hines* (1997) 15 Cal.4th 997, 1061.)

It is particularly appropriate to do so when a constitutional right is at stake.  (*Hale v.*

*Morgan* (1978) 22 Cal.3d 388, 394; see also Assem. Com. on Judiciary com., 29B Pt. 1A

West's Ann. Evid. Code foll. § 353, p. 599 ["[Evidence Code s]ection 353 is, of course,

subject to the constitutional requirement that a judgment must be reversed if an error has

resulted in a denial of due process of law."].)  Given that we have such discretion, one

sound reason to exercise it is to head off a future habeas petition asserting ineffective

assistance of counsel.  (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.)

Accordingly, in *People v. Underwood* (1964) 61 Cal.2d 113, the Supreme Court

reversed on the ground that statements by the defendant and a witness to the police were

involuntary, even though "defendant's attorney did not make a sufficient and timely

14

objection . . . ." (*Id*. at p. 126.)  It noted that "the evidence was uncontroverted that the prior statements of defendant and [the witness] were coerced . . . ."  (*Ibid*.)

Similarly, in *In re Cameron* (1968) 68 Cal.2d 487, the Supreme Court stated: "From the record at the trial it appears as a matter of law that the [defendant's] second confession was involuntary.  In such a case, a defendant is not precluded from raising the issue on appeal even though he did not object in the trial court.  [Citations.]"  (*Id*. at p. 503.)

By contrast, in *People v. Ray* (1996) 13 Cal.4th 313, the Supreme Court declined to consider a claim of involuntariness for the first time on appeal.  (*Id*. at p. 339.)  It explained that, because the defendant had not moved to suppress based on involuntariness, "the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings.  Under such circumstances, a claim of involuntariness generally will not be addressed for the first time on appeal.  [Citations.]"  (*Ibid*.; accord, *People v. Cruz* (2008) 44 Cal.4th 636, 669.)[4]

---

[4] *People v. Matteson* (1964) 61 Cal.2d 466, disapproved on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17 and *People v. Powell* (1967) 67 Cal.2d 32, 52, fn. 5, declared broadly that "[t]he introduction of an involuntary confession or admission requires reversal of a judgment of conviction despite defendant's failure to object to its introduction [citation] . . . ."  (*Matteson*, at p. 469.)

There, however, the defendant did object to the evidence (his statement and a handwriting exemplar) at trial (*People v. Matteson*, *supra*, 61 Cal.2d at pp. 468-469), so this declaration was dictum.  Moreover, there was no question regarding voluntariness; the trial court had found that the admission was involuntary, and there was

*[footnote continued on next page]*

In *People v. Kelly* (1992) 1 Cal.4th 495, the Supreme Court mused about whether the rule that an objection is not required when the evidence of involuntariness is uncontradicted "has survived in light of subsequent authority and the development of the law of ineffective assistance of counsel . . . ." (*Id*. at p. 519, fn. 5.) However, it did not answer this question. Hence, we remain bound to follow *Underwood* and *Cameron*.

To sum up, "because 'special policy considerations preclude the use of involuntary statements,' review of the admissibility of such statements based on the evidence that is not in conflict is permitted despite the lack of a timely objection. [Citation.]" (*People v. Cahill* (1994) 22 Cal.App.4th 296, 309, fn. 3.)

As we will discuss in more detail in part II.B.3, *post*, the only evidence that could possibly be relevant to the voluntariness of defendant's confession in this case consists of the interaction between defendant and Detective Munoz, and this evidence is not in conflict because the interaction was video-recorded.

We therefore conclude that we can reach defendant's contention that his confession was involuntary, despite defense counsel's failure to object.

---

"uncontradicted evidence" that the handwriting exemplar was given involuntarily. (*Id*. at p. 469.)

In light of the Supreme Court's later holdings in *Cruz* and *Ray*, the declaration in *Matteson* is overbroad. It must be understood to apply only when the evidence of involuntariness is not in conflict.

## 2. *General legal background.*

"""The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles. [Citation.]" (*Lego v. Twomey* (1972) 404 U.S. 477, 485, fn. omitted.) An involuntary confession is inadmissible for any purpose, including impeachment. (*People v. Bey* (1993) 21 Cal.App.4th 1623, 1627-1628.)

"[T]he due process voluntariness test . . . examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. [Citation.] The due process test takes into consideration 'the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.' [Citations.] The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' [Citation.]" (*Dickerson v. United States* (2000) 530 U.S. 428, 433-434.)

At one time, "[t]he test [wa]s whether the confession was '"extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."' [Citations.]" (*Hutto v. Ross* (1976) 429 U.S. 28, 30.) Since then, however, the Supreme Court has stated "it is clear that this passage . . . under current precedent does not state the standard for determining the voluntariness of a confession . . . ." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 285; see also *People v. Williams* (1997) 16 Cal.4th 635, 660-661.) "[U]nder current law, no

17

single factor is dispositive in determining voluntariness, but rather courts consider the totality of circumstances. [Citations.]" (*Williams*, at p. 661.)

"'[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' [Citations.] Coercive police activity, however, "'does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

### 3. *A threat to arrest or prosecute a relative*.

"A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid. [Citations.] However, where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate an admission. [Citations.]" (*People v. Steger* (1976) 16 Cal.3d 539, 550; accord, *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.)

For example, in *People v. Manriquez* (1965) 231 Cal.App.2d 725, disapproved on other grounds by *People v. Gastelo* (1967) 67 Cal.2d 586, 589, an informant bought heroin from the defendant at the defendant's home. (*Id.* at p. 727.) The police then entered the house "and arrested and handcuffed defendant, his wife, and other persons present." (*Ibid.*) A police officer testified, "I informed [the defendant] that if we had to

18

search the location and found any further narcotics and no one claimed ownership of the narcotics that we found, then we would have to arrest everyone and leave it up to the courts to decide who was the guilty person. He stated then, 'If I give you the narcotics, you will not take my wife to jail?' [¶] 'I stated, 'That is correct.''" (*Id*. at pp. 729-730.) The defendant then produced some heroin and some marijuana. (*Id*. at p. 730.)

The appellate court reversed. It stated, "A confession secured by a promise of reward or other inducement cannot be received into evidence. [Citation.] . . . Clearly, defendant's admission that he possessed narcotics in addition to those sold to the informer, and defendant's delivery of these additional narcotics to the officers, were induced by the promise that, if he did so, his wife would be released and not prosecuted." (*People v. Manriquez*, *supra*, 231 Cal.App.2d at p. 730.)

Here, Detective Munoz made an explicit threat to charge defendant's sons with homicide unless defendant confessed. Initially, he played on defendant's emotions by saying, "E[.] and both J[.] are a little afraid . . . ." Then he said, "I'm gonna have to charge them with the death of this guy." "Until I can find out what happened." Clearly, this meant finding out from defendant, not from some kind of independent investigation, as Detective Munoz also said, "[Y]ou're gonna be the one to help them."

When defendant said, "I'll talk to ya and tell ya what happened, okay?," Detective Munoz responded, "And then once we do all of that, then we'll be able to, you know, to clear them from this and then we'll move on, okay?" He added, "So I want to be able to

19

try to help you and your boys, mostly the boys," "[s]o we don't have to make them criminals."

This is not a case in which the defendant is "self-motivated" to clear a relative from suspicion. (See *People v. Steger*, *supra*, 16 Cal.3d at p. 550.) Before the threat, defendant did volunteer, "[T]hey didn't know nothin' about what was going on." However, this was hardly incriminating. It was perfectly consistent with his eventual testimony at trial that he was merely trying to get rid of a body mysteriously left outside his house. He said nothing to implicate himself in a crime until after Detective Munoz threatened to charge his sons with homicide.

The causal connection between the threat and the confession is clear. Immediately after it was made, defendant said, "Okay, well I'll talk to ya and tell ya what happened, okay?" When Detective Munoz said he was "try[ing] to help you and your boys," "So we don't have to make them criminals," defendant emphatically agreed, "Yeah, yeah, yeah, yeah." At the end of the interview, defendant expressed the causal connection himself by saying, "[I]t's all my fault and I'm willing to take the blame for it and . . . I just want them to be released because they had really nothing to do with it . . . ." Contrariwise, there is no evidence that defendant would have confessed even in the absence of the threat.

The People argue, however, that a threat to arrest or prosecute a relative is not coercive when the police have probable cause to believe the relative has committed a crime. We agree that this is the law.

20

The leading California case on this point is *People v. Boggs* (1967) 255 Cal.App.2d 693 (*Boggs*). There, the police asked Boggs to come to the police station; he arrived with his wife. (*Id.* at p. 697.) One Sergeant Hallinen *Mirandized* Boggs and interrogated him. (*Id.* at pp. 697-698.) Meanwhile, the police obtained information suggesting multiple people were involved in the crime. (*Id.* at p. 698.) Sergeant Hallinen told Boggs "he had received additional information and physical evidence which led him to believe 'that both he [and] Mrs. Boggs . . . were involved in this case'" and that he was going to book both of them "'unless [he] learned otherwise.'" (*Ibid.*) Sergeant Hallinen also asked Boggs "'why he would let his wife get involved in this?'" (*Ibid.*) Boggs then gave a confession. (*Id.* at p. 699.)

The appellate court held that the confession was not involuntary. (*Boggs*, *supra*, 255 Cal.App.2d at pp. 701-702.) It distinguished earlier cases, which had held that a threat to arrest a relative was coercive, on the ground that there, "the arresting officers threatened to arrest the families of the defendants for the purpose of eliciting the confessions." (*Id.* at p. 702.) "The fact that the confession of Boggs may have been motivated by a desire to clear his wife does not render his confession inadmissible unless the uncontradicted facts show that the police held Mrs. Boggs in custody for the purpose of securing a confession from Boggs. [Citations.]" (*Id.* at p. 701.) It noted that there was evidence "which justified Sergeant Hallinen's suspicion of Mrs. Boggs. Hallinen's question to Boggs as to why he would let his wife get involved can reasonably be construed as an expression of concern. . . ." (*Ibid.*; see also *People v. McWhorter* (2009)

21

47 Cal.4th 318, 352-358 [promise to let defendant's wife go if he gave a truthful and detailed confession was not coercive, in part because "'there were reasonable grounds for the detention of defendant's wife'" as an accessory]; *People v. Thompson* (1990) 50 Cal.3d 134, 160, 167-169 & 168, fn. 13 [officer's statement that he would not release the defendant's girlfriend "unless something else comes forward that can show that she's totally uninvolved" was not coercive, in part because the police had reasonable grounds to detain her as an accessory]; *People v. Jackson* (1971) 19 Cal.App.3d 95, 100-101 [threat to prosecute defendant's wife was not coercive, in part because "there were reasonable grounds for the detention of defendant's wife . . . ."].)

Federal cases make the point even more straightforwardly.

*United States v. Hufstetler* (1st Cir. 2015) 782 F.3d 19, cert. den. (2015) 577 U.S. 884, stated, "[W]here the referenced relative is both a family member and a co-suspect, probable cause for holding that individual helps to place the officers' statements in context. Without more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability. [Citations.]" (*Id.* at pp. 24-25.)

In *United States v. Miller* (7th Cir. 2006) 450 F.3d 270, cert. den. (2006) 549 U.S. 1097, overruled on other grounds in *Kimbrough v. United States* (2007) 552 U.S. 85, 93, fn. 4, 110, "the police . . . threatened to arrest [the defendant] and his girlfriend if he asked for an attorney or exercised his right to remain silent . . . ." (*Id.* at p. 272.) The

court held that the confession was not involuntary, because "[t]he police had probable cause to arrest them both . . . ." (*Ibid.*) "An objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements. [Citation.] But a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages. [Citation.]" (*Id.* at pp. 272-273; see also *Johnson v. Trigg* (7th Cir. 1994) 28 F.3d 639, 645 ["the effect of the arrest [of the defendant's mother] on [the defendant's] decision to confess could be used to invalidate the confession only if the arrest was made in order to induce him to confess."].)

Similarly, *United States v. Johnson* (6th Cir. 2003) 351 F.3d 254 held that "whether the threat to prosecute Tracy [the defendant's half-sister] was coercive turns on the issue of whether the threat could have been lawfully executed." (*Id.* at p. 263.) Reviewing the evidence, it concluded that "the police officers . . . ha[d] probable cause to arrest Tracy." (*Ibid.*) The threat therefore was not "objectively coercive." (*Id.* at p. 260, 263; see also *Thompson v. Haley* (11th Cir. 2001) 255 F.3d 1292, 1297 ["whether a threat to prosecute a third party [i]s coercive depends upon whether the state had probable cause to believe that the third party had committed a crime at the time that the threat was made"], cert. den. (2002) 536 U.S. 942; *Allen v. McCotter* (5th Cir. 1986) 804 F.2d 1362, 1364 [confession induced by threat to arrest the defendant's wife was not involuntary where there was probable cause to arrest her].)

23

Based on such cases, one state court has concluded, "It is widely accepted that a threat by law enforcement to arrest an accused's family member is not coercive if there is probable cause to arrest the family member. [Citations.]" (*State v. Grimes* (Neb. Ct. App. 2015) 23 Neb.App. 304, 316-317.)

We therefore accept the People's suggestion that a threat to arrest or prosecute a suspect's relative is not coercive when the police have probable cause to do so. On these facts, however, it does not help them.

According to what Detective Munoz told defendant, he did *not* have probable cause to charge defendant's sons with homicide. He said, "We talked to your — to, we talked to J[.], we talked to E[.] and they told me all about it . . . ." When defendant said, "They didn't know basically nothin'," Detective Munoz replied, "Well, I know that . . . ." Defendant insisted, "[T]hey had nothin' to do with it"; once again, Detective Munoz replied, "Okay, yeah, they told me that . . . ." He added, "they eventually told me everything that that they were asked to do. Okay, you're right, they had nothing to do with this, they didn't do this . . . ." "J[.] told me that if he knew what was going on and what happened, he wouldn't have gotten involved in this."

Detective Munoz did imply that defendant's sons might be accessories after the fact. Specifically, he said, "they're smart enough to realize why we going to Downey," and that their statements "lead us to believe something terrible happened to this guy . . . ." "[T]hey were just . . . asked to — to do certain things . . . ."

24

Being able to charge them as accessories after the fact, however, is not the same as being able to charge them "with the death of this guy." Moreover, Detective Munoz indicated that he intend to charge the boys (if at all) only with murder, not with being accessories after the fact. He agreed, "Okay, you're right, they had nothing to do with this . . . ." If defendant confessed, that would be sufficient to "clear them," "[s]o we don't have to make them criminals." Obviously, he was talking about charging defendant's sons with murder unless defendant confessed.

In sum, the only reasonable interpretation of Detective Munoz's statements is that he knew defendant's sons were not guilty of murder, but he intended to charge them with murder anyway, unless defendant confessed. That takes this case outside the safe harbor on which the People rely.

We recognize that, because defense counsel did not object to the admission of defendant's confession, the People have not had an opportunity to introduce evidence that the confession was nevertheless voluntary. On this record, however, there could be no such evidence. The interaction between Detective Munoz and defendant was video-recorded. It has been held that this eliminates any possible factual dispute and reduces the issue of voluntariness to a question of law. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 ["The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."]; *People v. McWhorter*, *supra*, 47 Cal.4th at p. 346 ["" . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the

25

appellate court may independently review the trial court's determination of voluntariness."'"'"].)

In theory, the People would be entitled to introduce evidence that defendant's personal characteristics — his "maturity, education, and physical and mental health" (*People v. Peoples* (2016) 62 Cal.4th 718, 740) — made him unusually resistant to coercion.  However, we cannot imagine any permutation of these factors that would steel a parent against a threat to arrest his or her teenaged children for murder.  The only evidence that the prosecution could conceivably introduce on that point would be that defendant was estranged from his sons and did not feel normal parental love for them.  The interview itself, however, shows that that was not at all the case.

Concededly, we have no record of the conversation between Detective Munoz and defendant's sons.  It is possible that Detective Munoz was lying — that he had not talked to them at all, or that they had not made the statements that he attributed to them.  It does not matter.  The voluntariness analysis looks to the effect that the challenged police tactic had on the defendant.  The representations that Detective Munoz made to defendant, whether true or false, were inherently coercive and did, in fact, coerce defendant.

        4.     *Prejudice*.

We turn to whether the error was prejudicial.  "[T]he test of prejudice for admitting a coerced confession is the *Chapman*[5] test, requiring reversal unless the error was harmless beyond a reasonable doubt.  [Citations.]"  (*People v. Johnson* (1993) 6

---

    **5**     *Chapman v. California* (1967) 386 U.S. 18, 24.

Cal.4th 1, 32, disapproved on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 879; see also *Arizona v. Fulminante, supra,* 499 U.S. at pp. 303, 306-312; *People v. Cahill*, *supra*, 5 Cal.4th at pp. 509-510.)

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .' [Citations.]" (*Arizona v. Fulminante*, *supra*, 499 U.S. at p. 296.)

The People argue that, even without the confession, "there was overwhelming evidence . . . that appellant murdered the victim." Most of the evidence that they point to, however — (1) defendant was seen trying to dispose of the body; (2) defendant tried to set the body on fire; (3) defendant fled from the police; and (4) defendant tried to clean up blood stains in his garage — was consistent with defendant's alternative explanation. Moreover, they are not sufficient to show that the killing was first-degree murder rather than second-degree murder or involuntary manslaughter.

The only exception is that defendant's stepmother-in-law testified that he said "he was going to take care of" someone named "Maurice" because "he was hearing on the streets that there was going to be a home invasion." However, she was inferably biased, because defendant had been the driver in the accident that paralyzed her stepdaughter.[6] Moreover, the statement she attributed to defendant would have been vague and obscure

---

[6] Apparently she displayed bias on the stand. In his closing argument, defense counsel said, "I did want her to give us an illustration of just how hostile she is to Mr. Jimenez. She didn't let us down there, did she? . . . [S]he hates his guts . . . ."

27

without his confession; it would have been speculative to suppose that "Maurice" even referred to Morris Barnes.

In light of his confession, however, that statement became clear. In the confession, he referred to the victim as "Maurice." He also explained the background of the killing — that he expected the victim or his fellow gang members to rob his home and hurt his mother. He said he started thinking about killing the victim when the victim walked by his garage, and he finally decided to do so because the victim was "play[ing] stupid."

In short, defendant's confession was the only clear evidence of premeditation, intent to kill, and motive. Hence, we cannot say, beyond a reasonable doubt, that if defendant's confession had been excluded, the jury still would have found him guilty of first-degree murder. At a minimum, it might well have found him guilty of a lesser offense, such as second degree murder or involuntary manslaughter.

By contrast, the confession was irrelevant to the charges of reckless evading and aggravated assault on a peace officer. Those convictions were based on eyewitness testimony, not on defendant's confession. It follows that the error was harmless as to those counts.

### III

### THE SUFFICIENCY OF THE EVIDENCE OF AGGRAVATED ASSAULT

Defendant contends that there was insufficient evidence to support the two counts of aggravated assault on a peace officer. He argues that he did not use either a deadly

weapon or force likely to cause great bodily injury. He also argues that he did not have the necessary awareness that his conduct would directly and probably result in a battery.

"'We often address claims of insufficient evidence, and the standard of review is settled. "A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"' [Citation.]" (*People v. Flinner* (2020) 10 Cal.5th 686, 748.)

The elements of assault are that:

"1. The defendant did an act that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

"3. When the defendant acted, (he/she) was aware of facts that would lead a reasonable person to realize that (his/her) act by its nature would directly and probably result in the application of force to someone; [¶] [and]

"4. When the defendant acted, (he/she) had the present ability to apply force to a person . . . ." (CALCRIM No. 915; see also § 240; *People v. Wyatt* (2012) 55 Cal.4th 694, 702.)

29

Aggravated assault additionally requires that the assault be made either "with a deadly weapon or instrument . . . or by any means likely to produce great bodily injury . . . ." (§ 245, subd. (c); see also *id*., subds. (a)(1), (a)(4), (d).)

"'[E]xcept in those cases involving an inherently dangerous weapon[,] the jury's decisionmaking process in an aggravated assault case . . . is functionally identical regardless of whether . . . the defendant employed a weapon alleged to be deadly as used or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used.' [Citations.]" (*In re B.M.* (2018) 6 Cal.5th 528, 535.)

"[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.)

"One may commit an [aggravated] assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

*People v. Bipialaka* (2019) 34 Cal.App.5th 455 is all but on point. There, the defendant was high on methamphetamine. He put on a mask "to freak people out." (*Id.* at p. 457.) An officer tried to pull him over for speeding. Instead of yielding, he ran a

30

red light. Another car, already legally in the intersection, came to a stop. The defendant, yelling threats and still "[d]riving at high speed," "swerved and barely avoided a collision." (*Id*. at p. 458) He later admitted that he "purposely drove at the couple in the car because 'I was just going crazy and felt like freaking them out.'" (*Ibid*.)

The appellate court held that this constituted aggravated assault. (*People v. Bipialaka*, *supra*, 34 Cal.App.5th at pp. 458-462.) "[The] test for assault is whether a reasonable person, viewing the facts known to Bipialaka, would find that the act in question would directly, naturally, and probably result in physical force being applied to another . . . . [Citation.]" (*Id*. at p. 459.) "He knew he had donned the mask for the purpose of scaring others. He likewise knew he opportunistically targeted people in another car to the same end. Bipialaka knew his purpose was to use his masked face and his speeding car to freak them out. Targeting a car this way would directly, naturally, and probably result in physical force being applied to the target car because a high speed collision applies force to the victim car and its occupants." (*Ibid*.)

"*Bipialaka's swerve does not alter the analysis*. Assault does not require an intent to cause an application of physical force or substantial certainty that force will be applied. [Citation.] As he bore down on his target, Bipialaka achieved his purpose of scaring his victims into believing a serious collision was imminent. He attempted by physical menace to put others in fear of imminent serious bodily injury. That is assault . . . ." (*People v. Bipialaka*, *supra*, 34 Cal.App.5th at pp. 459, italics added.)

31

While there are factual differences between *Bipialaka* and this case, none of them is legally significant. For example, Bipialaka admitted an intent to scare; this intent was also shown by his mask and his threats. Here, defendant claimed that "at first," he did not see the police cars; thereafter, he tried to avoid hitting them. Nevertheless, the jury could reasonably infer an intent to scare. Both police cars had their headlights and overhead lights on; defendant inferably was able to see them. Moreover, there was space to go around them, on the right, as the pursuit vehicles did. Nevertheless, defendant aimed straight at them. He did not slow down until just two seconds before he made contact. One of the two officers did not realize that he slowed at all. Both officers believed defendant was going to hit their vehicles. One officer thought he "was going to get hurt pretty bad." Defendant inferably was trying to scare them so they would get out of his way.

In any event, aggravated assault is a general intent crime. It does not require the specific intent to injure (or to scare). (*In re B.M.*, *supra*, 6 Cal.5th at pp. 533-534.) The only mental state it requires is "aware[ness] of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from the defendant's conduct." (*People v. Wyatt* (2010) 48 Cal.4th 776, 779.) Knowing that one is speeding toward another car, without slowing normally, is just such an mental state. Like Bipialaka's last-minute swerve, defendant's last-minute slowing does not alter the analysis.

Defendant argues that, unlike the defendant in *Bipialaka*, he was "driving the car in a normal manner unlikely to cause injury." However, he was going 30 to 45 miles an hour on a residential street, where the speed limit was 25. He did not yield to police vehicles, with flashing lights, blocking the road. He did not slow as one normally would for an obstacle. All of this was likely to cause injury.

Defendant also notes that the officers got out of their cars and ran to the sides of the road. He argues that, at that point, he was not using force likely to harm anyone, and he knew he could not harm anyone. By then, however, the assault had already started. The officers got out of their cars precisely because defendant was going too fast, was not slowing down at all, and appeared to be about to hit their cars. Defendant did not necessarily see them get out; it was dark, and bright lights were shining in his face. He did not testify that he saw them get out. But even if he did see them, the assault had already been committed. "[A]n aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway." (*In re B.M.*, *supra*, 6 Cal.5th at p. 537.)

Defendant posits that, if driving 40 miles an hour toward a parked car is assault, then driving 40 miles an hour when cars ahead are stopped for a stop sign is also assault. This ignores the fact that he kept going 40 (or 45) miles an hour for far too long — long enough to make the officers believe they would be hurt — and slowed just two seconds before making contact. Essentially, he asks us to infer that, because he *could* slow, it was obvious that he *would* slow. To the contrary, however, because he did *not* slow *when a*

*normal driver approaching an obstacle would*, he did an act which by its nature would directly and probably result in great bodily injury.

We therefore conclude that there was sufficient evidence that defendant committed two counts of aggravated assault.

IV

MOTION TO STAY THE RESTITUTION FINE

After entry of judgment, defendant filed a motion to stay the restitution fine (§ 1202.4), based on inability to pay. He contends that the trial court erred by denying this motion on the ground that it had lost jurisdiction.

Because we are reversing the sentence, this contention is moot. When defendant is resentenced, he will be free to argue that he lacks the ability to pay any applicable fines or fees.

V

DISPOSITION

The judgment is reversed solely with respect to the conviction on count 1 (murder) and with respect to the sentence; in all other respects, it is affirmed. On remand, if the People do not bring defendant to a new trial on count 1 in a timely manner (see § 1382, subd. (a)(2)), then our remittitur will be deemed to modify the verdict by striking the conviction on count 1 and the trial court must promptly resentence defendant.

CERTIFIED FOR PARTIAL PUBLICATION

<u>RAMIREZ</u>
P. J.

34

I concur:

McKINSTER _____
                                          J.

[*People v. Jimenez*, E074849]

RAPHAEL, J., Dissenting.

After they drank a beer in his garage, defendant Enrique Mayorga Jimenez killed his friend Morris Barnes by stabbing him several times in the neck and back with a kitchen knife. Jimenez then enlisted his two teen-aged sons to help him dump the body and burn it in a field. They were caught in the act, and a chase led to the trio's arrest.

Jimenez confessed to the crime in a lengthy recorded statement. He never attempted to suppress his confession, which was played for his jury at trial. Though the issue was never raised in trial court, today's opinion nevertheless reverses Jimenez's murder conviction on the ground that his confession was involuntary.

This is the wrong approach. The issue is forfeited, and we cannot properly rule for Jimenez on direct appeal. Jimenez never claimed that his confession was involuntary, so there was no opportunity to litigate the heavily factual issue of voluntariness. This is not the rare case where it would be appropriate to reach the merits of the issue despite forfeiture. Moreover, if left with the record we have, we should hold that the confession was voluntary under constitutional standards.

I.      THE CONFESSION

Assisted by his sons, Jimenez attempted to dispose of the body of his murder victim in the early morning hours of May 20, 2016, around 1:00 a.m.. Their flight from the police ended with all three arrested.

1

John Munoz, who interviewed Jimenez, had been a homicide detective for 23 years and a policeman for a total of 36 years. Munoz first interviewed Jimenez's sons, though we do not have the recordings of those interviews in our record. He then interviewed Jimenez at 9:50 a.m. Jimenez acknowledged that he understood his *Miranda* rights and agreed to speak to Munoz. He expressed no reluctance. When Jimenez testified at trial, he said about Munoz: "I felt comfortable with him." He testified that he "wasn't afraid of him." He agreed that he was "willing" to talk with him about the incident.

Jimenez's video recorded interview with Munoz, played to his jury, lasted about one hour and forty minutes. He described how he killed Barnes, using Munoz as the victim to act out the killing. He also described in detail how he wrapped up Barnes and put him in a trash can for disposal. During the interview, Jimenez made approximately 17 statements to the effect that his sons did not know anything about the crime, and he stated repeatedly that he did not want his sons to go to jail or that he wanted them to be cleared.

In the interview, Jimenez did not state that he wished to help his sons avoid a murder conviction in particular; he simply indicated a desire to have them released from custody and cleared of crimes. When he testified at trial, he explained that he confessed to Munoz because he wanted to obtain his sons' release without any charges:

"Q. . . . Why did you tell Mr. Munoz that you killed Mr. Barnes?

"A. He told me that I would be the only one to help my kids. He says, "You can help your boys not be criminals."

\*\*\*

"Q. Did you want to help your boys?

"A. Of course.

"Q. And how did you think you could do that?

"A. To say it was me. Everything was me.

"Q. Okay. You think that's what Munoz wanted from you?

"A. I believe so. I believed if I told him what he wanted to hear, make things easier for everybody, that my boys would be let go."

Jimenez underscored that at the end of the interview he asked Munoz to "let them go." He testified that his "main purpose" was to get Munoz to believe him so that he would be "releasing my boys." He testified that his objective in talking to Munoz was to divert attention from his sons. Indeed, while Jimenez claimed to have been "lying" when he confessed, he testified that his purpose in doing so was to protect his sons from "juvenile hall":

"Q. And when you talked to Detective Munoz, did you have any purpose in lying other than protecting your two sons?

"A. That was it. That was it. . . . I don't want my boys in juvenile hall and stuff like that."

Jimenez further stated:  "I opened up to him, thinking that he can help me if I just said the things I needed, and he can let my kids go."  He stated that he "just wanted to make sure that [he would] leave my kids alone."  He again confirmed that his "main concern" was his boys.  While he agreed with a question confirming that he did not want his sons "to be charged with the death of Morris Barnes," he did not indicate that the crime of murder was his sole, or predominant, concern.  He again stated that he thought that if Munoz believed him, "my boys would be released."  He indicated that he was unhappy that the boys were not immediately released at the end of his interview.

## II.    FORFEITURE

Under the Due Process Clauses of the Fifth and Fourteenth Amendments, a confession is involuntary when the product of "'coercive police conduct.'"  (*People v. Caro* (2019) 7 Cal.5th 463, 492.)  The test for coercive police conduct is whether the defendant's "'"'will has been overborne and his capacity for self-determination critically impaired'"'" by improper coercion.  (*Ibid.*)

In examining whether an accused's will was overborne, a court must examine "'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"  (*People v. Thompson* (1990) 50 Cal.3d 134, 166.)  An officer's coercive conduct must be "'a motivating cause of the decision to confess'" to render a confession involuntary; that is, the officer's improper statements "'must be causally linked'" to the defendant's confession.  (*People v. Wall* (2017) 3 Cal.5th 1048,

4

1066; *People v. Linton* (2013) 56 Cal.4th 1146, 1177 [""The statement and the inducement must be causally linked""].)

Importantly here, "a claim of involuntariness generally will not be addressed for the first time on appeal." (*People v. Ray* (1996) 13 Cal.4th 313, 339.) This is because where the defendant has not moved to suppress his confession as involuntary, the parties had "no incentive to fully litigate" the matter, "and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings." (*Ibid*.; see also, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 387-388 [involuntariness claim forfeited].)

Indeed, because determining whether a defendant's will has been overborne by police questioning involves an "intensely factual inquiry," it is a particularly "poor candidate for first-time consideration on appeal." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 78.) The United States Supreme Court has recognized the "complexity in determining whether an accused's will has been overborne—facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative." (*Jackson v. Denno* (1964) 378 U.S. 368, 390.) Thus, the "overall determination of the voluntariness of a confession" is "an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation, and unbeclouded by other issues and the effect of extraneous but prejudicial evidence." (*Ibid*.) Our Supreme Court has likewise recognized that because the matter "'largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. . . . [T]he question

5

is necessarily addressed, in the first instance, to the judge. . . .'" (*People v. Kendrick* (1961) 56 Cal.2d 71, 84.)

In this case, to claim his confession was involuntary, Jimenez needed to file a suppression motion that identified exactly how Munoz caused his will to be overborne. He needed to identify an improperly coercive statement (or statements) by Munoz that caused him to confess when he otherwise would not have. If Jimenez had asserted that much, the People would have the chance to (for example) offer testimony from Munoz explaining his interrogation strategy, in support of arguments that the detective did nothing improper. The People also would have the opportunity to try to show the trial court that (for example) Jimenez made a calculated decision to confess to attempt to free his sons, rather than acting out of an overborne will. Both sides would have had a chance to offer witness testimony, and if they did, the trial court could have reached a decision based in part on the demeanor and credibility of those witnesses. Jimenez never filed such a motion, so we should find the issue forfeited.

The majority attempts to circumvent forfeiture based on the general proposition that we can consider on direct appeal issues that present pure questions of law on undisputed facts, even where not raised in trial court. (Maj. opn., *ante*, at pp. 14-16.) Due to this principle, it is theoretically possible that there could be some circumstance where a confession could properly be found involuntary on direct appeal even without a suppression motion filed. The majority cites two cases as examples, each from over 50

years ago.  (Maj. opn*., ante*, at pp. 14-15.)  Even these cases are hardly relevant, however, demonstrating the rarity of the majority's approach here.

One of the majority's two cases was not a direct appeal, but rather adjudicated petitions for writs of habeas corpus, where a court appointed referee "held hearings and heard testimony" on whether the confessions were voluntary.  (*In re Cameron* (1968) 68 Cal.2d 487, 496.)  Such a petition is the way that, today, a defendant like Jimenez could potentially develop a record to challenge his conviction where he failed to file a motion at trial.  The other case, *People v. Underwood* (1964) 61 Cal.2d 113, 119-121, involved a trial where the defendant offered "uncontradicted testimony" that the police "repeatedly awakened him during the night" to make him "physically exhausted" and an officer told him that if he did not confess the officer would see to it that he was "'escorted to the gas chamber.'"  (See *People v. Thompson*, *supra*, 50 Cal.3d at p. 169 ["Confession[s] induced by threats of prosecution for a capital crime have been held inadmissible"].)  The prosecution had a chance to refute that testimony, but did not.  There was no testimony even remotely resembling that here.

The majority suggests another way to turn this forfeited issue into one that we can entertain.  The majority claims that where an interrogation was video recorded, that "eliminates any possible dispute and reduces the issue of voluntariness to a question of law."  (Maj. opn., *ante*, at p. 25.)  This is wrong.  A recording eliminates disputes about what was said, but it does not eliminate the need to determine the effect of those words on the accused.  (See, e.g., *Stein v. New York* (1953) 346 U.S. 156, 185 [issue depends

7

"upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal"].)

One of the two cases that the majority cites for the proposition that a recording makes voluntariness a matter of law, *People v. McWhorter* (2009) 47 Cal.4th 318, 346, italics added, holds that a tape recording means that an appellate court may "'independently review *the trial court's determination* of voluntariness.'" This holding, of course, assumes there is a trial court determination. It requires a more searching appellate review where portions of a trial court's ruling (unlike credibility determinations) turn on the words of a transcript. But it does not mean voluntariness is a question of law that can be decided by an appellate court on a confession transcript alone. In *McWhorter*, the defendant offered detailed testimony from a forensic psychiatrist, who had met with the defendant for several hours. The psychiatrist concluded that the "defendant's will was psychologically and emotionally overborne" such that he believed he could protect his family only by confessing. The trial court made detailed findings, and found part of the confession admissible and part not. (*Id*. at pp. 344-346.) In its review, our Supreme Court relied on the fact that the trial court "carefully reviewed" the transcript and issued a "detailed explanation of its ruling"; the Court's "independent review" confirmed that the trial court "exhaustively considered" the defendant's claims. (*Id*. at pp. 347-348.) The circumstances here are different.

8

Likewise, in the other case the majority cites for the idea that a transcript creates a forfeiture exception, *People v. Linton*, *supra*, 56 Cal.4th at p. 1164, there was an "extended evidentiary hearing" in trial court, and our Supreme Court stated that deferential "'substantial evidence'" review applies to trial court findings on disputed facts.  (*Id*. at pp. 1176-1177.)  The appellate court's independent review applied "to the extent the interview [was] tape-recorded."  (*Id*. at 1177.)  Upholding a trial court denial of a suppression motion based on independent review *to the extent* a transcript supports the ruling is a far cry from allowing appellate review of a transcript to substitute for a trial court ruling.[1]

In my view, this case presents a straightforward circumstance where we should hold the claim of voluntariness forfeited.  Jimenez did not challenge his confession in trial court, and if he wants to bring such a challenge, the People deserve a chance to litigate the factual issues in trial court.  I nevertheless will discuss next what our record shows about the voluntariness of the confession, as I think that even if we focus on the record we have, the majority is wrong to reverse the conviction.[2]

---

[1]  Moreover, an independent standard of review "is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different."  (*In re George T.* (2004) 33 Cal.4th 620, 634.)  Under independent review, "factual determinations that are based on '"the credibility of witnesses the [superior court] heard and observed"' are entitled to particular deference."  (*People v. Vivar* (2021) 11 Cal.5th 510, 527.)

[2]  While I dissent from the published portion of today's opinion, I concur in the unpublished portion, sections III and IV.

III.    THE VOLUNTARINESS OF THE CONFESSION

About 88 years ago, the court of appeal articulated the principle that the police may not use the threat of imprisoning a relative to coerce a defendant into confessing. (*People v. Mellus* (1933) 134 Cal.App. 219, 225.)  Since then, a few published cases have reversed convictions where police had essentially promised to release the defendant's relative if the defendant confessed, thereby suggesting that otherwise the relative would be held in custody and charged.  (See *People v. Trout* (1960) 54 Cal.2d 576, 584-585 (*Trout*), overruled on other grounds by *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn.17; *People v. Manriquez* (1965) 231 Cal.App.2d 725, 730 (*Manriquez*) disapproved on other grounds by *People v. Gastelo* (1967) 67 Cal.2d 586, 589.)

As the majority recognizes, however, the situation is quite different if the police have probable cause to believe that the relative committed a crime.  (Cf. *Trout*, *supra*, 54 Cal.2d at p. 584 [noting that police had "no grounds" to arrest defendant's wife]; *Manriquez*, *supra*, 231 Cal.App.2d at p. 728 [police found narcotics in defendant's wife's purse only after defendant confessed that they were there because police promised not to arrest his wife if he disclosed the drugs' location].)  The majority goes so far as to state as a blanket matter "that a threat to arrest or prosecute a relative is not coercive when the police have probable cause to believe the relative has committed a crime."  (Maj. opn., *ante*, at p. 20.)[3]  Here, the majority nevertheless finds the police conduct irredeemably

_____

[3]  The majority's formulation overstates the latitude given to police under California law.  There can be improperly coercive threats made to an accused person concerning their family member, even if there is probable cause to charge the other

*[footnote continued on next page]*

coercive because Munoz's statements indicated "he knew defendant's sons were not guilty of murder, but he intended to charge them with murder anyway, unless defendant confessed." (Maj. opn., *ante*, at p. 25.)

The initial problem with the majority's approach is that Jimenez testified, and he did not purport to be coerced by the statements that the majority deems to have overborne his will. In his trial testimony, Jimenez alluded to *different* statements by Munoz that he viewed as causing his confession. When the interview began, Munoz had indicated that *he* was the one to charge the boys and that what he learned from Jimenez would make the difference. But in his testimony, Jimenez noted that at the end of the interview, Munoz said that he would communicate to the district attorney (Munoz had said that "they'll decide what they are gonna do with your boys"). Jimenez testified that he had thought that Munoz "would let them go" but instead Munoz said he would "see what [he] can do." "And if that was gonna be the deal," Jimenez testified, "then I wouldn't have said nothing."

Jimenez seems to have been claiming that Munoz gave the impression that he made the charging decisions but later said that he did not. In this appeal, neither Jimenez nor the majority argue that this type of deception by Munoz was unconstitutionally

---

person. (See *People v. Thompson*, *supra*, 50 Cal.3d at pp. 168 fn. 13, 169 ["problematic" statements indicating that the defendant's refusal to confess was responsible for his girlfriend's incarceration, though there was probable cause for her arrest]; *People v. Haydel* (1974) 12 Cal.3d 190, 199-201 [defendant's statements held involuntary as the product of psychological coercion by connecting them to freeing his wife, where she was caught in the act of grand theft with him].) As in other contexts, the test for coerciveness is whether the defendant's will was overborne by improper police tactics.

11

coercive. That is understandable, as officers are permitted to use deceptive statements in questioning a suspect. Their "use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) This was a type of deception that might encourage Jimenez to talk but not the type that would physically or psychologically overcome his will.

Crucially, Jimenez did *not* testify that Munoz coerced him in the way the majority theorizes.[4] In my view, this alone precludes finding the statements unconstitutionally coercive. If this were not enough, it is important that, even before Munoz made the statements that concern the majority, Jimenez also volunteered that his sons "didn't know . . . what was going on" and "didn't know basically nothin'." He was obviously eager to communicate this to Munoz. Jimenez voiced no particular reluctance to talk to Munoz during the hour and forty minute interview; he waived his *Miranda* rights; and, when he testified at trial, he agreed that he had been "willing" to speak with Munoz and "felt comfortable with him." In some respects, Jimenez's testimony refuted a claim that his will was overborne.

Our record thus indicates that the mere fact that his sons were in custody and facing the possibility of charges was enough to make Jimenez confess. When directly asked why he confessed, Jimenez said: "He told me that I would be the only one to help

---

[4] Jimenez testified that he recalled Munoz telling him "Your boys are being arrested for murder." That was not literally what Munoz said, but, in any event, Jimenez did not allude to that statement as motivating him to confess.

12

my kids. He says, 'You can help your boys not be criminals.'" Telling Jimenez that his statements may help his kids is not improperly coercive: """ [when] the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made.'" (*People v. Thompson*, *supra*, 50 Cal.3d at p. 170.) Jimenez agreed that his purpose in confessing to Munoz was the general one of "protecting" his sons and keeping them out of "juvenile hall." (See *People v. McWhorter*, *supra*, 47 Cal.4th at pp. 355-356 ["""The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary"""].) While I would not bar Jimenez from trying to demonstrate something different in a habeas petition, our record today shows that he confessed for reasons that have been held to result from a suspect's free will, not from improper police coercion.

Lastly, I am not convinced that Munoz did anything improperly coercive in questioning Jimenez. I applaud the majority's attentiveness to ensuring that officers avoid unconstitutional coercion, but the effort is misdirected here.

When Munoz questioned Jimenez, it was just a few hours after the arrest of the trio caught attempting to burn a body. There was probable cause to arrest all three for at least the felony of accessory to murder (see Pen. Code, § 836, subd. (a)(2)), and there was ample suspicion to investigate whether any, or all, of the three might have committed, or assisted or conspired with each other in committing, the murder itself. Munoz

interviewed the sons first, and according to what Munoz told Jimenez, one son told him that he saw a foot in the trashcan, and they thought Jimenez was taking them to get rid of the body. Munoz, of course, needed not accept conclusively a statement from the sons that they did not participate in the murder itself (if they made such statements). The Jimenez interview occurred while officers were still piecing together what had happened. The transcript of Munoz's interview of Jimenez shows that even during that interview Munoz learned new information from other officers who were examining the body in the trashcan.

As no actual "charges" were required to be filed until arraignment (or, for the sons, the juvenile court equivalent), Munoz may have described the situation roughly accurately in stating that he was "gonna have to charge them with the death of this guy. . .[u]ntil I can find out what happened."[5] It would have been more accurate to say something like the sons were "under investigation for charges ranging up to murder, depending on the evidence we uncover, and your information might help them." But Munoz hardly exaggerated the situation in which Jimenez's sons found themselves at the outset of an investigation arising out of their disposing a stabbed-to-death body in a field in the dark of night. Indeed, Jimenez's confessing may well have helped clear his sons of crime, as Jimenez wished.

---

[5] In reviewing the claim that a confession was improperly coerced, we are obliged to accept the ""version most favorable"" of the facts to the prosecution. (*People v. McCurdy*, *supra*, 59 Cal.4th 1063, 1086.)

14

Munoz made deceptive statements that put him on Jimenez's side, such as "you're right, they had nothing to do with this." Even as he told Jimenez this, his comments disclosed that he did not mean "nothing" literally. At the outset, he also told Jimenez that his sons had "admitted . . . some things"; that there were "some little things that. . .they knew. . .they're smart enough to realize why" Jimenez was taking them to a place to dump the body; and that they "told me everything that they were asked to do." Although I understand the majority's concern that Munoz's statements were deceptive, the law allows officers to "establish a rapport" with a defendant, and, if successful, that "does not establish that defendant's free will was overborne." (*People v. McCurdy*, *supra*, 59 Cal.4th at p. 1088.) Our Supreme Court has upheld as non-coercive the police tactic of suggesting explanations that would establish a suspect's innocence, to encourage the defendant to provide the details of the crime. (*People v. Williams* (2010) 49 Cal.4th 405, 444.) Munoz did not even do that much, only indicating, perhaps deceptively, some agreement with a view Jimenez had already articulated.

Officer interrogation tactics are sometimes deceptive or manipulative, but such tactics have often been upheld as not unconstitutionally coercive. The majority's quick finding of coerciveness here contrasts with our Supreme Court's analysis in a case with similarities to this one, *People v. Howard* (1988) 44 Cal.3d 375, 397-398. In *Howard*, the defendant was questioned as a murder suspect and denied being the killer, while the defendant's girlfriend and his son, who had roles in the murder plot, were questioned separately. (*Id.* at p. 396.) The defendant stated, "'I don't want to keep my son involved,

15

because he wasn't involved in nothing'" and said his girlfriend wasn't involved. (*Ibid.*) The officers told him that the others had implicated him; played some portions of their interviews; said he was letting "'this chick and son take a fall'"; and said that he would not want somebody he loved to "'ride a beef'" for him. (*Ibid.*) The defendant confessed, saying that he would take the fall, while the officers assured him "'it's not gonna involve your boy.'" (*Ibid.*) The Supreme Court held that no "improper threats or promises" were made to the defendant. (*Id*. at p. 398.) The "two were important witnesses and the police were fully justified in exploring the facts with them" and the police "disclaimed an interest in involving the two throughout the interviews with defendant." (*Id*. at p. 399.) Each case must be decided on its circumstances, but *Howard* at least demonstrates that the majority reaches its involuntariness conclusion too readily.

Neither the majority nor I observed the witnesses testify. Notably, however, Jimenez's lawyer provided this view of Munoz's conduct in closing argument, after he and the jury had heard the recorded confession and testimony from Munoz and Jimenez: "[L]et's also take a look at Munoz and his conduct there. Because I think you will agree with me that he's an exemplary officer who did not do anything improper in this case, and certainly didn't do anything else to force anybody to say what they said."

The majority reasonably presumes that Jimenez felt tremendous pressure to confess and try to clear his sons of crime. (Maj. opn., *ante*, at pp. 25-26.) Our record, however, discloses the person overwhelmingly responsible for that pressure. That person

16

was not a police officer.  It instead was the person who prompted his sons' arrest by rounding them up for the late night task of dumping and burning a murder victim's body.

RAPHAEL

J.